MARTIN M. FAHEY, Plaintiff-Appellant, *v.* HOLY FAMILY HOSPITAL, Defendant-Appellee.

(No. 59479; ■■■■■■■■■

First District (2nd Division)—September 16, 1975.

*Rehearing denied October 14, 1975.*

Daniel A. Costigan, of Chicago, and Craig & Craig, of Mattoon (Jack E. Horsley, Richard F. Record, Jr., and Richard C. Hayden, of counsel), for appellant.

Robert J. Di Leonardi, of Des Plaines, for appellee.

Mr. JUSTICE LEIGHTON delivered the opinion of the court:

This is an interlocutory appeal, the outgrowth of a controversy between a surgeon and a private hospital concerning application of a rule which would require him to consult a qualified member of the hospital's obstetrics and gynecology department before he performs any major gynecological surgery in the hospital. The surgeon filed a complaint by which he sought to restrain enforcement of the rule. After the hospital filed its answer, the surgeon made a motion for temporary injunctive relief which the trial court denied. The issue before us is whether the trial court erred in denying the motion for a temporary injunction.[1]

## I.

Martin M. Fahey is a physician and surgeon who was licensed to practice medicine in Minnesota in 1944 and in Illinois in 1948. He received his undergraduate education at the University of West Virginia and studied medicine there for two years before transferring to Rush Medi-

cal School of the University of Chicago from which he was graduated in December 1941. He served an internship of one year in Chicago; and then, from January 1, 1943, until October 1, 1949, with a two-year absence for military service, he was a Fellow in surgery at the Mayo Foundation in Rochester, Minnesota. During his military service, he was in the Medical Corps of the United States Army and performed general surgery in army hospitals to which he was assigned. His training at Mayo was in general surgery, neurological procedures and operative gynecology. In 1949, he became a member of the medical staff of St. Francis Hospital in Evanston, Illinois. Two years later, he earned the recognition of a specialist in general surgery, having received the certificate of a surgeon from the American Board of Surgery.

On March 10, 1961, Dr. Fahey was appointed to the medical staff of Holy Family Hospital with privileges in the Department of General Surgery. The hospital is in Des Plaines, Illinois. It is a not-for-profit corporation organized under State law and operated by the Sisters of the Holy Family of Nazareth, an order of Catholic Church nuns. Under its bylaws, the hospital is controlled by a Governing Board; and for administrative purposes, its medical services are divided into departments, one being the Department of Obstetrics and Gynecology.[2] The hospital's physicians and dentists are organized into a medical and dental staff and are granted practice privileges by the Board. Under its bylaws, and those of the staff it approves, the Governing Board has final responsibility on all matters affecting staff privileges in the hospital. Every staff member is entitled to appropriate authority and responsibility for the care of his or her patients, subject to limitations contained in staff and Board bylaws, those contained in a staff rule or regulation, or to those expressed in restrictions attached to an appointment. The bylaws of the medical and dental staff provide that "[i]n any case where the Credentials Com-

---

[1] The brief for appellant presents three differently phrased issues. However, where a trial court denies a motion for a temporary injunction, the sole question presented on appeal is whether denial of injunctive relief was an abuse of judicial discretion. *Toushin v. City of Chicago*, 23 Ill.App.3d 797, 320 N.E.2d 202; *Gifford v. Rich*, 58 Ill.App.2d 405, 208 N.E.2d 47.

[2] A hospital's department of obstetrics and gynecology combines two related areas of medical science: gynecology, which deals with diseases that are peculiar to women, primarily those of the genital tract, as well as female endocrinology and reproductive physiology; obstetrics, which deals with the care of pregnant women during pregnancy, parturition and puerperium. Gynecologic surgery may be defined as the operative or manual treatment of those diseases which are peculiar to women, primarily those of the genital tract. See Stedman's Medical Dictionary 543, 1225, 867 (3rd Unabridged Lawyer's ed. 1972); B. S. Maloy, Medical Dictionary for Lawyers 239, 421, 367 (1942); 70 C.J.S. *Physicians & Surgeons* § 1 (1951).

mittee does not recommend for reappointment or the Executive Committee does not recommend reappointment, or where reduction of privileges is recommended, the Administrator shall notify the physician or dentist concerned and he shall be given an opportunity of appearing before the Credentials Committee and Joint Conference Committee in joint session. After a hearing as outlined above, the Joint Conference Committee shall make final recommendation to the Governing Board."

On August 10 of the year he became a staff member at Holy Family, Dr. Fahey requested that the hospital grant him full privileges under which he could perform gynecological surgeries. His request was supported by a document that listed 271 major surgical gynecological procedures he had performed in three Chicago area hospitals. The Board granted his request with the limitation that his privileges not include consultation in operative gynecology. This was done although Dr. Fahey was not a member of the hospital's obstetrics and gynecology department; in fact, he was the only surgeon on the hospital general staff who had privileges that allowed him to perform major gynecological operations. He continued to enjoy these privileges, undisturbed, from October 6, 1961, when they were granted him, until early in March 1970.

At its meeting on March 10, 1970, the Governing Board approved a recommendation and adopted a rule for its obstetrics and gynecology department which required any physician not a member of that department to request a consultation with one of its qualified members before any major gynecological operation was performed in the hospital. When Dr. Fahey was informed of this fact, he declared that the rule reduced his privileges because he had always performed major gynecological operations without consulting any other physician in the hospital. Therefore, invoking the bylaws of the medical and dental staff, he took an appeal and demanded a hearing. One was given him; and at its conclusion, the committee authorized to hear him recommended to the Governing Board that Dr. Fahey be exempted from the rule. The Board approved this recommendation and so notified Dr. Fahey on April 16, 1970. This exemption was the only one authorized by the Board.

Dr. Fahey's status with regard to this matter continued until July 21, 1972, when he received a letter from Sister Mary Amata Sweeney, the hospital administrator, telling him that the Governing Board had decided to enforce, uniformly and without exemption, all rules of the obstetrics and gynecology department. This included the requirement that non-gynecologists request a consultation with a qualified member of the Department of Obstetrics and Gynecology before performing any major gynecological operation in the hospital. The consultation was to be without charge to the patient.

Dr. Fahey immediately responded to Sister Amata's letter, protesting the Board's decision and contending that it was a reduction of his privileges, one imposed on him without a hearing, in violation of medical and dental staff bylaws. He demanded a hearing. Sister Amata, however, refused to authorize one because in her view, and that of the Governing Board, application of the rule to him was not a reduction of Dr. Fahey's privileges; it was only a uniform enforcement of a rule throughout the hospital medical staff. Dr. Fahey, nonetheless, argued that the Board was not uniformly applying a rule because he was the only surgeon affected; he was the only member of the medical staff who had been exempted from the consultation requirement. Despite his insistence, a hearing was not given Dr. Fahey; so, he filed the suit in this case and then made his motion for a temporary injunction.

At its hearing, the testimonial evidence came from five witnesses, four in support and one against the motion. The physical evidence came in 11 exhibits, seven in support and four against the motion, including a copy of the Standards for Obstetric-Gynecologic Hospital Services published by the American College of Obstetricians and Gynecologists and the bylaws which showed that when staff privileges at Holy Family Hospital were to be reduced, the doctor involved was entitled to a hearing before final recommendations were made to the Board.

Dr. Fahey testified concerning his qualifications as a surgeon, his experience as a staff member of Holy Family Hospital, his exemption from the consultation rule and the notice he received, without a prior hearing, that the exemption was being removed by the hospital Governing Board. He described to the trial judge how he went to Sister Amata and told her that application of the rule to him was going to ruin his professional standing as a highly regarded surgeon and lead to the loss of his practice. He said that Sister Amata replied, "Oh, doctor, this doesn't mean very much. All you have to do is tell your patient in the hospital that the rules require you to have a consultation with a member of the Department of Gynecology and Obstetrics." This assurance, Dr. Fahey said, did not calm his concern. He told the court of his request for a hearing that was denied and of his belief that the recommendations of the obstetrics and gynecology department that the consultation rule be uniformly applied were brought about by fellow doctors who were envious of his success as a gynecologic surgeon.

Three colleagues of Dr. Fahey testified for him with two of them saying they were familiar with the consultation rule, and it was their opinion that such a mandatory requirement demeaned a doctor in the estimation of his patients. One doctor with extensive medical practice experience explained to the trial judge that the opinion of a consulting

doctor was not binding on the requesting doctor. The consulting doctor comes into the medical case; he may or may not examine the patient and he may or may not convey his views to him; he forms his opinion, enters it on the patient's medical chart, and thereafter it is for the requesting doctor to decide how he will proceed.

Sister Amata was the hospital's only witness. She testified about her training and education in hospital administration, her knowledge of the consultation rule, its origin and purpose. She said the decision of the Governing Board to remove Dr. Fahey's exemption from the rule came on recommendation of the obstetrics and gynecology department that its rules be uniformly applied to all members of the hospital medical staff. This recommendation resulted from the department's conclusion that it could function efficiently only if its rules were uniformly enforced. She said the Board in reviewing its obstetrics and gynecology department was faced with the choice of either phasing it out or enforcing the department's rules as it had recommended. She insisted there was no substance to Dr. Fahey's belief that application to him of the rule was brought about by envious fellow doctors. She testified to having told Dr. Fahey he could not have a hearing because she and members of the Governing Board did not look upon its application as a reduction of his privileges. They were not telling Dr. Fahey that he could not perform major gynecologic operations in the hospital; all they were requiring of him was to request a consultation before doing so. The consultation was to be free of any expense to the patient. The objective of the consultation rule was improved patient care and, as is the case with consultations among physicians generally, it was not intended to bind or limit the professional discretion of the requesting doctor. Sister Amata told the trial judge that there had never been any question about Dr. Fahey's capabilities as a surgeon; no one had complained about any operation performed by him. She said that her feelings and those of the hospital concerning Dr. Fahey's competence as a general surgeon were very high. She believed that the Governing Board, out of courtesy to him, would be willing in good faith, to give Dr. Fahey a hearing consistent with staff bylaws; but it would be bound by the recommendation of its obstetrics and gynecology department.

After hearing the evidence and listening to the arguments of counsel, the trial court entered an order in which it found that the consultation rule the hospital was seeking to apply to Dr. Fahey would remove an exemption in his favor and thus reduce his privileges within the meaning of the medical and dental staff bylaws. Therefore, he was entitled to a hearing before the rule could be applied to him. Accordingly, the trial

court ordered the hospital to give Dr. Fahey a hearing but denied his motion for a temporary injunction.

## II.

In resolving the issue before us, we observe that this is not the case of a private hospital refusing either to make or renew the staff appointment of a physician. (Compare *Mauer v. Highland Park Hospital Foundation*, 90 Ill.App.2d 409, 232 N.E.2d 776; *Silver v. Castle Memorial Hospital* (1972), 53 Hawaii 475, 497 P.2d 564.) Nor is this the case of an appeal based on the claim that contrary to applicable bylaws, the staff privileges of a physician were revoked or terminated without a hearing. Compare *Ascherman v. San Francisco Medical Society* (1974), 39 Cal.App.3d 623, 114 Cal. Rptr. 681.

■■ The case here is one in which the trial court found that a hospital's removal of a rule exemption enjoyed by a surgeon reduced his staff privileges. This finding is not questioned in this court by the hospital involved. The hospital was ordered to give the surgeon, Dr. Fahey, a hearing in accordance with the bylaws of its medical and dental staff. In this appeal, he does not question this phase of the court's order. This is understandable because that ruling is consistent with decisions of other jurisdictions which hold that bylaws are an integral part of the contractual relation between a hospital and the members of its staff. *Berberian v. Lancaster Osteopathic Hospital Association, Inc.* (1959), 395 Pa. 257, 149 A.2d 456; *Adler v. Montefiore Hospital Association* (1973), 453 Pa. 60, 311 A.2d 634; see Note, *Denial of Hospital Staff Privileges: Hearing and Judicial Review*, 56 Iowa L. Rev. 1351 (1971).

Dr. Fahey argues, however, that the trial court erred in denying him temporary injunctive relief. He insists that the exemption he enjoyed from the hospital's consultation rule was a valuable property right; it related to his practice of surgery, the pursuit of his chosen profession, a right that would be destroyed if the exemption were removed. Therefore, the hospital could not take away the exemption solely in order to administer, more effectively, its department of obstetrics and gynecology. Dr. Fahey points to his impeccable qualifications as a surgeon, general and gynecologic, his 11 years of staff membership, the more than 1000 gynecologic surgeries he has performed without consultation; and he argues that consultation by him is not required in order that the hospital improve the care of patients. Consequently, the Governing Board's decision to remove the exemption from him was so unreasonable and arbitrary that it denied him procedural due process, even though it was the action of a private hospital.

Holy Family counters Dr. Fahey's arguments with the contention that under the hospital's bylaws its Governing Board has final responsibility for staff appointments and for the grant, renewal, revocation or termination of staff privileges. The Board's determination concerning these matters, the hospital insists, are not judicially reviewable; but in any event, removal of Dr. Fahey's exemption from the consultation requirement was in fact a uniform application of a rule within the hospital's medical staff. For these reasons, the trial court could not interfere with the decision of the Governing Board by issuance of a temporary injunction.

From these arguments and the contention advanced to meet them, there arises the question whether a private hospital, solely in order to administer and regulate its obstetrics and gynecology department, can remove an exemption enjoyed by a staff surgeon and require him to consult with a qualified member of its obstetrics and gynecology department before he performs any major gynecological operation in the hospital, even though the surgeon has been on the hospital staff for 11 years and, without consulting any other physician, has efficiently and satisfactorily performed more than 1000 major gynecologic operations. The answer to this question, in our judgment, is found in the legal principles that define the autonomy and power of governing boards of private hospitals.

## III.

■■ It is generally said that all classes of hospitals have at least one power in common. All of them can prescribe reasonable rules for the conduct of their affairs; and all may adopt rules that standardize the administration of their particular institution. (See *Olander v. Johnson*, 258 Ill.App. 89; compare *Harris v. Thomas* (Tex. Civ. App. 1920), 217 S.W. 1068.) A governing board to which is committed the management and control of a private hospital has the power to adopt any regulation that is reasonable and consistent with its general purposes. (See *People ex rel. Replogle v. The Julia F. Burnham Hospital*, 71 Ill.App. 246, 249.) And where the bylaws of a private hospital place on its governing board the final responsibility for staff appointments and granting of privileges, loss of staff privileges which may cause a physician inconvenience and probably loss of income, standing alone, will not justify the issuance of a temporary injunction against the hospital. (*Rutledge v. St. Vincent Memorial Hospital*, 67 Ill.App.2d 156, 214 N.E.2d 131.) This is so because issuance of a temporary injunction to prevent modification or revocation of staff privileges would determine, in effect, the manner by

which a governing board is to discharge its responsibility. Compare *State ex rel. Sams v. Ohio Valley General Hospital Association* (1965), 149 W.Va. 229, 140 S.E.2d 457, 462; *Shulman v. Washington Hospital Center* (D.C. 1963), 222 F.Supp. 59; *Levin v. Sinai Hospital* (1946), 186 Md. 174, 46 A2d 298.

In this case, the bylaws placed final responsibility for staff appointments and granting of practice privileges in Holy Family Hospital on its Governing Board. Accordingly, and on a department recommendation, the Board adopted a rule that required all nongynecologist surgeons to consult with a qualified member of the obstetrics and gynecology department before any major gynecological surgery was performed in the hospital. Dr. Fahey was a nongynecologist, although a competent and highly regarded surgeon, general and gynecologic. He was not an obstetrician; he was not a member of the obstetrics and gynecology department. A physician like Dr. Fahey, although he is licensed to practice medicine in this State, does not have an absolute right either to staff membership or practice privileges in a private hospital. (See *Dayan v. Wood River Township Hospital,* 18 Ill.App.2d 263, 152 N.E.2d 205.) And in the exercise of its discretion as a managing authority, the governing board of a private hospital has the right to regulate licensed physicians or even exclude them from the use of hospital facilities. (See *Rao v. Auburn General Hospital* (1973), 10 Wash. App. 361, 517 P.2d 240; 40 Am.Jr.2d *Hospitals and Asylums* § 8 (1968).) Therefore, the consultation rule which in this case only restricted Dr. Fahey's use of the facilities in Holy Family Hospital could be applied to him. However, on his first appeal, and on recommendation of the committee that heard him, the Board, although it did not have to, exempted Dr. Fahey from the rule. He enjoyed this exemption for more than two years when it was called to the Board's attention that the obstetrics and gynecology department was not functioning properly because of uneven application of its rules. The evidence in the record suggests to us, as it must have to the trial judge, that the difficulties of the hospital's obstetrics and gynecology department resulted, in part, from the conflict caused by the exemption that had been given Dr. Fahey. As a consequence, the Board had to decide whether the rules of the department were to be uniformly applied to all members of the medical staff, or only to some. It decided on uniform application so that instead of danger to its continued existence, there could be assurance of proper and effective administration of the obstetrics and gynecology department.

Dr. Fahey has argued in the trial court and before us that, as a result of his competence and high standing as a general and gynecologic sur-

geon, the Board could not remove his exemption from the consultation rule because there was no reason for the removal. Dr. Fahey insists that consultation requested by him, when discovered by his patient, demeaned him in the patient's estimation with resulting deterioration and ultimate loss of his professional practice. In our judgment, there is no substance to this argument.

Without claiming special insight into the relation that exists between a surgeon and a patient who comes to him for a gynecological procedure, we are tempted to observe that clients of lawyers and the patients of doctors have much in common. Whatever may be their differences, both professional relations depend in large measure on interpersonal candor, confidence and trust. For this reason, we believe that a patient in need of a gynecologic surgery who is told, honestly and forthrightly, as Sister Amata suggested to Dr. Fahey, that a hospital rule requires the surgeon to consult with a qualified member of the obstetrics and gynecologic department before he performs a major gynecological procedure, will understand that explanation without any deterioration in her relation with the surgeon. This belief finds support in section VII, paragraph A of the Standards for Obstetric-Gynecologic Hospital Services of the American College of Obstetricians and Gynecologists in which members of the profession are told that "[t]he free use of consultations serves as a means of maintaining high standards of professional service. Consultation in no way suggests incompetence; rather, it indicates a high degree of maturity and judgment. The patient is accorded the advantages of additional thought and experience in the management of her problem. The physician shares the responsibility for this professional decision and also increases his own knowledge. The hospital maintains its high standards by the free use of additional professional judgment, thus preventing avoidable errors. In general, it is the duty of the attending physician to decide whether or not a consultation is in order, but under certain specified conditions, consultation is and should be mandatory."

■■ This standard was part of the evidence received at the hearing of Dr. Fahey's motion for temporary injunction. The allegations of the complaint and those of the motion had been put at issue by answers, without any question being raised concerning sufficiency of the pleadings. The trial court heard evidence and reviewed the issues, including Dr. Fahey's claim that, without a hearing, as required by staff bylaws, the Governing Board of the hospital had reduced his staff privileges. Therefore, the rule of *Mauer v. Highland Park Hospital Foundation*, 90 Ill.App.2d 409, 232 N.E.2d 776, that a private hospital's actions concerning staff appointments or privileges are not subject to judicial review,

does not apply to this case. We conclude, as did the trial court, that Holy Family Hospital acting through its Governing Board had the authority to adopt the consultation rule and remove the exemption it had granted Dr. Fahey. It could do this despite Dr. Fahey's competence and high standing as a general and gynecologic surgeon. (See *Edson v. Griffin Hospital* (1958), 21 Conn.Supp.55, 144 A.2d 341.) For these reasons, the trial court did not err in denying Dr. Fahey's motion for a temporary injunction. (See Annot., 37 A.L.R.3d 645, 681 (1971).) The order is affirmed.

Affirmed.

DOWNING, P. J., and STAMOS, J., concur.